UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ENDOTACH LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | No. 1:13-cv-01135-LJM-DKL |
| COOK MEDICAL INCORPORATED, ) | |
| ) | |
| Defendant. ) | |

## ORDER ON DEFENDANT'S MOTION TO DISMISS

This cause is now before the Court on Defendant Cook Medical Incorporated's ("Cook's") Motion to Dismiss for Lack of Subject Matter Jurisdiction: No Standing ("MTD"). Dkt. No. 67. This is the second time that Cook has alleged that Plaintiff Endotach, LLC, does not have the legal right to make accusations of infringement of the patents-in-suit, U.S. Patent Nos 5,122,154 (the "'154 patent") and 5,593,417 (the "'417 patent") (collectively, the "Rhodes patents"). In an earlier-filed suit styled *Endotach, LLC v. Cook Medical Incorporated*, 1:12-cv-01630-LJM-DKL ("*Endotach I*"), Cook alleged that an assignment agreement between the inventor's widow, Mrs. Brenda Rhodes ("Mrs. Rhodes") and Endotach was insufficient to transfer any rights to the Rhodes patents to Endotach; the Court agreed. *Endotach I*, Dkt. No. 158. In the instant matter, Cook contends that the new 2013 assignment agreement between co-trustees of the trust created by the inventor, Dr. Valentine Rhodes ("Dr. Rhodes"), and Endotach was also insufficient to transfer any rights in the Rhodes patents to Endotach because during his lifetime Dr. Rhodes granted exclusive rights to the patents to Johnson & Johnson Interventional Systems Co. ("JJIS") and efforts made by Mrs. Rhodes

independent of the trust did not effectively extinguish those rights. *See, generally*, Dkt. No. 70-1. Endotach asserts that a written document from JJIS evidences its intent to disavow any rights in the Rhodes patents or the license and, even if it did not, the co-trustees had the right to proceed with an infringement suit; therefore, their transfer of that right to Endotach was valid. *See, generally*, Dkt. No. 89.

The Court has considered the parties' arguments and the relevant documents and concludes that Endotach has standing to bring suit. For the reasons stated herein, Cook's MTD is **DENIED**.

## I. FACTUAL & PROCEDURAL BACKGROUND

The background for the instant motion is, in part, dependent upon the facts Cook's Motion to Dismiss filed in *Endotach I*, therefore, relevant portions of the factual background from the Court's order on Cook's prior motion are also set forth here.

As previously stated, Dr. Rhodes is the inventor of the Rhodes patents; the '154 patent issued on June 16, 1992, Dkt. No. 1-1, '154 Patent, at 2 of 13; the '417 patent issued on January 14, 1997, Dkt. No. 1-2, '417 Patent, at 2 of 10. The patents are directed to intraluminal and endovascular grafts for placement within a blood vessel, duct or lumen to hold it open. '154 Patent, Abstract; '417 Patent, Abstract. Applying the relevant portions of 35 U.S.C. § 154, the '154 patent expired on August 15, 2010; the '417 patent will expire on November 27, 2015. *See* 35 U.S.C. §§ 154(a)(2) & (c)(1); '154 Patent, at 1; '417 Patent, at 1.

In November 1995, Dr. Rhodes and JJIS executed a licensing agreement ("JJIS Agreement"). Dkt. No. 70-3, Rhodes/JJIS License Agreement. The JJIS Agreement states, in relevant parts:

JJIS wishes to received from RHODES an exclusive worldwide license to his proprietary information, including patents and patent applications in the Field (as defined below);

* * *

1.4 "Field of the Agreement" (also "Field") shall mean devices a portion of which is placed within a lumen of the body to maintain the patency of the lumen, and more particularly stents, and grafts associated with their use, and the manufacturing methods of such stents and stent grafts.

1.5 "Improvements" shall mean all modifications, variations, revisions, and new models of the Technology (as later defined) or the subject matter and claims of Licensed Patents, or any part thereof, as well as all processes, machines, manufacturing methods or compositions of matter which RHODES may conceive, discover, or develop.

1.6 "Licensed Patents" shall mean U.S. Patent 5,122,154 and any patent application previously or hereafter filed on behalf of RHODES claiming Technology or Improvements, and any United States or foreign patent now issued or hereafter issuing on any such patent application, including but not limited to the list of RHODES patent applications and patents attached hereto and periodically updated as Appendix A.

* * *

1.12 "Technology" shall mean
    (i)    all inventions, know-how, technical data, desing, flow charts, models, concepts, ideas, methods, processes, machines, manufactures, compositions of matter, software, firmware and discoveries owned by RHODES related to the creation and development of a device for use in the Field, and such devices for use in the Field, and related manufacturing technology; and

    (ii)    any of such technology as described in the foregoing clause (i) that is acquired by RHODES subsequent to the Effective Date.

* * *

2.1 <u>Worldwide Exclusive License.</u>  RHODES hereby grants to JJIS, and JJIS accepts, upon the terms and conditions set forth in this Agreement, a worldwide exclusive license, under Technology, Improvements and Licensed Patents, in each case, within the Field, to make, have made, use and sell Licensed Products within the Field to sue the name RHODES, and, subject to Paragraph 2.2, to grant non-exclusive Sublicenses to others within the Field to  have Licensed Products made for JJIS in the event JJIS is unable to meet the need for such Licensed Products.

3

\* \* \*

4.1 <u>Technology and Improvements.</u> All Technology and Improved conceived and/or reduced to practice by RHODES shall be the property of RHODES throughout the world, subject to all licenses granted to JJIS hereunder.

\* \* \*

5.1 RHODES and JJIS shall each give prompt notice to one another of any infringement of a Licensed Patent by Third Parties as may come to their knowledge.

5.2 JJIS shall have the right to pursue legal action against infringement of a Licensed Patent by Third Parties. RHODES shall have the right to thereafter participate equally (monetarily), upon written request to JJIS, although JJIS shall conduct the conduct of the litigation. . . .

5.3 If JJIS as not, within six months of notice provided under Paragraph 5.1, brought suit for infringement, RHODES may, at his option, bring suit for infringement. If RHODES brings such suit, he shall bear his own costs but JJIS shall thereafter have the right to participate equally (monetarily) in the litigation, which shall then be controlled by RHODES. . . .

\* \* \*

7.4 <u>Term.</u> Unless terminated earlier under other provisions of this Agreement, this Agreement shall remain in effect for the later of the duration of the Licensed Patents or until the Technology becomes publicly known.

7.5 <u>Termination.</u> JJIS may terminate the exclusive license granted under this Agreement by giving sixty (60) days' prior written notice to RHODES. Upon such termination, the licenses granted to JJIS in this Agreement will become non-exclusive.

*Id.*

Later in November 1995, Dr. Rhodes filed the application that matured into the '417 patent. '417 Patent, at 1. The '417 patent specification states, "The graft of my aforementioned ['154] patent makes use of some anchoring means . . . . While such anchoring means are believed effective for their intended purpose, they never the less

4

appear to be amenable to improvement insofar as graft retention is concerned." *Id.* col. 3, ll. 21-27.  That specification also states, "[T]he subject invention makes use of anchoring means . . . which offer an improvement in retention over the 'protuberances' disclosed in my aforementioned ['154] patent." *Id.* col. 5, ll. 13-17.

On July 29, 1999, Dr. Rhodes executed in Florida a Last Will and Testament (the "Will").  *Endotach I*, Dkt. No. 132-5.  Although the Will bequeaths all "tangible personal property" to his wife, Brenda Rhodes ("Mrs. Rhodes"), there is no specific bequest of the Rhodes patents or mention of any intangible property.[1]  *Id.*   The Will names Mrs. Rhodes as Dr. Rhodes' Personal Representative.  *Id.*   The Will's residuary clause bequeaths "all the residue of [Dr. Rhodes'] estate, real and personal" to a Trust, of which he and Mrs. Rhodes were Trustees, "for the uses and purposes and subject to the terms and provisions thereof . . . ."  *Id.* at 4.

The Trust is also dated July 29, 1999, and provides that any property added to it "by bequest" or other method "shall be covered by the provisions of this Trust, the same as if originally included hereunder."  *Endotach I*, Dkt. No. 125-2, ¶ 2.  Among the powers granted to the Trustees of the Trust are powers "to sell, transfer, exchange, or lease any real or personal property of the trust estate . . .; . . . to execute and deliver any deeds, leases, assignments or other instruments as may be necessary to carry out the provisions of [the] Trust; . . ." and "to do all such acts, take all such proceedings and to exercise all rights and privileges . . . with relation to any such property, as if the absolute owners thereof and in connection therewith to make, execute and deliver any instruments and to enter into any covenants or agreements binding any trust created

---

[1] In *La Belle Iron Works v. United States*, 256 U.S. 377, 389 (1921), the Supreme Court described patents as "intangible property."

5

hereunder." *Id.* ¶ 13.  The Trust provides that upon Dr. Rhodes' death, his daughters, Josette J. Carroll ("Josette") and Amanda J. Rhodes-Finley ("Amanda"), would become Co-Trustees with Mrs. Rhodes.  *Id.* ¶ 16(A).

Dr. Rhodes died in 2000.  *Endotach I*, Dkt. No. 1, Compl. ¶ 10.

On March 10, 2001, in her capacity as Personal Representative, Mrs. Rhodes signed an Inventory, under the penalties of perjury, of "all the property of the estate." *Endotach I*, Dkt. No. 132-6.  There is no mention of the Rhodes patents and it lists "Miscellaneous tangible personal property" in the amount of $1,000.00.  *Id.* at 4.

On November 20, 2009, Mrs. Rhodes executed a document entitled "Exclusive License Agreement," (hereinafter, "Endotach License Agreement") as "patent owner." Dkt. No. 89-13, at 12.  The agreement purports to transfer an exclusive license to the '417 patent to Acacia Patent Acquisition LLC, now known as Acacia Research Group LLC ("Acacia").   *Id.* at 2.  Specifically, the Endotach License Agreement states, in pertinent part:

> Licensor grants to [Acacia] all substantial rights in and to the Patents including the worldwide exclusive right and license under the Patents, including the exclusive right to grant sublicenses, to sue for and collect past, present and future damages and to seek and obtain injunctive relief for infringement of the Patents.

*Id.* at 2.

On November 7, 2011, Acacia executed a document entitled "Assignment and Assumption Agreement," which purports to assign its rights under the Endotach License Agreement to Endotach.  Dkt. No. 89-14.

In March 2012, Mrs. Rhodes, through counsel, approached JJIS's Associate Patent Counsel, Paul Coletti ("Coletti"), regarding the JJIS Agreement.  Dkt. No. 70-5,

Letter, From John R. Lolio, Jr. to Paul Coletti, Mar. 9, 2012.  Mrs. Rhodes represented herself as the successor-in-interest to the Rhodes patents and requested that JJIS sign a mutual release based on the assumption that the JJIS Agreement expired upon expiration of the '154 patent in 2010.  *Id.*  Initially, JJIS refused the request because not all of Dr. Rhodes' patents were addressed in the mutual release Mrs. Rhodes had prepared.  Dkt. No. 70-6, Email String starting with one from Paul Coletti, to John Lolio, Subj.: RE: Dr. Valentine Rhodes [SSKRP-ACTIVE.FID12751], May 18, 2012, at Bates No. J&J0012.  In May 2012, Coletti forwarded a revised termination and mutual release document to Mrs. Rhodes' attorney, which referenced both the '154 and the '417 patents; however, it still referred to the expiration of the '154 patent as the reason for termination of the JJIS Agreement.  *Id.* at Bates Nos. J&J0012 & J&J0014.

On May 29, 2012, Mrs. Rhodes again sent a letter to Coletti seeking termination and a mutual release under the JJIS Agreement.  Dkt. No. 70-7.  The letter included a termination and release document, which Mrs. Rhodes executed on May 31, 2012; Coletti made some minor changes to the termination and release document and executed it on June 7, 2012, on behalf of JJIS.  *Id.* at Bates No. J&J0019.  The executed termination and release agreement states, in relevant parts:

> Johnson & Johnson Interventional Systems ("J&J") and Brenda Rhodes (hereinafter "Rhodes"), successor under the Estate of Dr. Rhodes to Patent No. 5,122,154 which expired on or about August 15, 2010 (the "'154 Patent") and the License Agreement, each confirm that the License Agreement expired and terminated on or about August 15, 2010 with the expiration of the '154 Patent.
>
> Each of J&J and Rhodes does hereby for itself and its respective legal successors, heirs and assigns, release the other party from and against all claims, demands, liabilities and obligations arising out of or in connection with the J&J License Agreement, the '154 Patent and each of the related patents to the '154 Patent, that is U.S. Patent Nos. 5,593,417 and

7

> 5,843,160 . . . .  Rhodes further agrees to indemnify, defend and hold J&J harmless from all claims, demands, liabilities and obligations arising out of, related to or in connection with the J&J License Agreement and the '154 Patent and the Related Patents.

*Id.*

JJIS never made or sold a product covered under the JJIS Agreement.  Dkt. No. 89-15, Coletti Dep. at 35.  In fact, no one referenced the JJIS Agreement with Coletti from the date it was signed until Mrs. Rhodes contacted him in 2012.  *Id.* at 44.  When she did contact him, Coletti testified that "it was [his] hope to create a document which would both protect JJIS or the J&J entities as well as terminate the agreements to the satisfaction of Mrs. Rhodes."  *Id.* at 48.  Coletti further testified that it did not matter to JJIS what dates were identified as the termination dates of the JJIS Agreement because JJIS was more concerned with receiving a release from the Rhodeses than what Mrs. Rhodes intended to do with the patents.  *Id.* at 65-66.  JJIS considered the JJIS Agreement terminated no later than June 2012 when JJIS executed the termination and release document.  *Id.* at 69.

On June 18, 2012, Mrs. Rhodes executed a document entitled "Amendment," as "Patent Owner," which purports to amend the Endotach License Agreement to add the '154 patent as a licensed patent.  Dkt. No. 89-19, at 2.

On June 21, 2012, Endotach filed *Endotach I* alleging that Cook infringes the Rhodes patents.  *Endotach I*, Dkt. No. 1.

On July 12, 2013, an "Amendment 3" to the Endotach License Agreement was entered into and made effective to transfer an exclusive license of the Rhodes patents to Endotach from the Trust and is signed by all three Trustees.  Dkt. No. 89-11.  *See also Endotach I*, Dkt. No. 142-5 (Patent Assignment between parts of the Trust).

8

Four days later, on July 16, 2013, Endotach filed the instant suit. Dkt. No. 1.

By Order dated August 6, 2013, the Court dismissed *Endotach I*, without prejudice, because Endotach lacked standing to bring suit, but the issue could be cured. *Endotach LLC v. Cook Med. Inc.*, Cause No. 1:12-cv-01630-LJM-DKL, 2013 WL 4012960 (S.D. Ind. Aug. 6, 2013) (hereinafter *"Endotach I"*). By order dated August 22, 2013, the Court denied Cook's motion to dismiss this law suit as duplicative. *Endotach LLC v. Cook Med. Inc.*, Cause No. 1:13-cv-1135-LJM-DKL, 2013 WL 4509857 (S.D. Ind. Aug. 22, 2013).

## II. **STANDARD**

Standing is a jurisdictional requirement for which Endotach bears the burden of proof. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (citing *Perry v. Vill. of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999)). Cook has made a factual challenge to Endotach's standing; therefore, the Court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* at 444 (quoting *Evers v. Astrue*, 536 F.3d 651, 656-57 (7th Cir. 2008) (further citations omitted)). As the Court has stated before, "[t]he principle of standing that is important in this case is whether or not Endotach had any legal rights and interests to the Rhodes patents at the time it filed suit because it 'cannot rest [its] claim to relief on the legal rights and interests of third parties.'" *Endotach I*, 2013 WL 4012960, at *2 (quoting *G&S Holdings LLC v. Continental Cas. Co.*, 697 F.3d 534, 540-41 (7th Cir. 2012) (further citation omitted)).

9

### III. DISCUSSION

Endotach argues that Cook is a stranger to the JJIS Agreement, therefore, it cannot challenge the effectiveness of the termination and release agreement executed by Mrs. Rhodes and JJIS. Dkt. No. 89, at 10-12. Even if Cook could challenge the validity of the JJIS Agreement or the termination and release agreement, the latter agreement effectively terminated the JJIS Agreement, which allowed Mrs. Rhodes and her Co-Trustees properly to transfer rights to the patents-in-suit to Endotach. *Id.* at 12-21. Endotach further argues that Mrs. Rhodes had some rights to the 1995 license as a "legal representative[], successor[] [or] assign[];" and even if she did not have full authority to act on behalf of the interests of the Trust, JJIS and Mrs. Rhodes both mistakenly believed she had such authority and by their actions since then, including testimony given in this matter, have ratified the termination and release agreement. *Id.* at 17-21. Endotach also asserts that even if the 2012 termination and release agreement was ineffective to terminate the JJIS Agreement, the Trust still retained the rights of Dr. Rhodes under that agreement to sue infringers, which right was properly transferred to Endotach. *Id.* at 21-25.

Cook asserts that the Court may review any documents necessary to determine whether or not Endotach has standing, including the JJIS Agreement and the 2012 termination and release agreement. Dkt. No. 104, at 2. Further, Cook argues that the JJIS Agreement is still in effect because both parties mistook the actual termination date of the JJIS Agreement and because Mrs. Rhodes could not unilaterally terminate the agreement because she was not a successor-in-interest and could not stand in the shoes of the Trust. Dkt. Nos. 70-1, at 9-12 & 104, at 3-5. Finally, Cook avers that

Endotach does not possess any exclusionary rights in the patents-in-suit because the Endotach License Agreement, in any form, does not purport to transfer the Trust's rights to sue under the JJIS Agreement, which are the only rights that belonged to the Trust at the time the Endotach License Agreement was executed. Dkt. Nos. 70-1, at 12-13 & 104, at 6-7.

The Court starts with the premise that "[a] patentee may not give a right to sue to a party who has no proprietary interest in the patent." *Ortho Parma. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1034 (Fed. Cir. 1995) (citing *Crown Die & tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 44 (1923); *Life Time Doors, Inc. v. Walled lake Door Co.*, 505 F.2s 1165, 1167-68 (6th Cir. 1974); *Overman Cushion Tire Co. v. Goodyear Tire & Rubber Co.*, 49 F.2d 998 (2d Cir.), *cert. denied*, 287 U.S. 651 (1932)). In the cited cases, a proprietary interest means that the party has the right to exclude others from making, using or selling the invention. If these rights had already been granted exclusively to JJIS, even the patentee, Dr. Rhodes, could not give another party the right to sue independently. Therefore, Endotach's right to sue Cook turns on whether the JJIS Agreement had been terminated prior to execution of Amendment 3.

The Court reiterates that the patents-in-suit are intangible property that would pass through the Trust. *See LaBelle Iron Works v. United States*, 256 U.S. 377, 389, 41 S.Ct. 528, 56 L.Ed. 998 (1921). The Court further concludes that the JJIS Agreement[2] was also intangible property that would pass through the Trust. *See* Fla. Stat. Ann. § 731.201(32) (defining "property" as "both real and personal property or any interest in it and anything that may be the subject of ownership"); *Jacbobson v. S.E. Pers. Leasing,*

---

[2] There is no dispute that both the '154 and the '417 patents were Licensed Patents under the JJIS Agreement.

*Inc.*, 113 So. 3d 1042, 1051 (Fla. Dist. Ct. App. 2013) (referring to "intangible property such as . . . contract rights"); *M.F. Fletcher Assocs., Inc. v. Caramanica*, 708 F. Supp. 1263, 1265 (M.D. Fla. 1989) (discussing conversion of intangible property including contact rights); *accord King v. Ionization Int'l, Inc.*, 825 F.2d 1180, 1188 (7th Cir. 1987) (concluding that a patent license is intangible property under Illinois law). Mrs. Rhodes, a co-trustee, could not unilaterally agree with JJIS to terminate the JJIS Agreement.

However, the JJIS Agreement allowed JJIS to terminate its exclusive license upon sixty days' notice to Dr. Rhodes and, under the terms of the agreement, his successors. Dkt. No. 70-3, JJIS Agreement, ¶ 7.5. Even if the termination and release document was not a binding contract between the Trust and JJIS, it could reasonably be interpreted as JJIS' written notice of its intent to terminate the exclusive license under the JJIS Agreement. The termination and release document itself evidences that JJIS sought to terminate its licensing relationship to the patents-in-suit because it unequivocally states that JJIS agreed that the JJIS Agreement terminated on or about August 15, 2010, upon expiration of the '1574 patent and that it was releasing the other party from all "claims, demands, liabilities and obligations arising out of and obligations arising out of or in connection with the J&J License Agreement . . . ." Dkt. No. 70-7, at Bates No. J&J0019. Such an interpretation is consistent with Coletti's testimony that JJIS was unconcerned with the date of termination because it had no interest in the patents; its only concern was that JJIS, or any Johnson & Johnson entity, had a release. Dkt. No. 89-15, Coletti Dep. at 48, 65-66 & 69. It is further supported by JJIS's disinterest in this suit and failure to take any action to enforce any rights it had in the Rhodes patents, in fact, it expressly disavowed any interest in the patents when it

12

executed the termination and release document. Dkt. No. 70-7, at Bates No. J&J0019. Accordingly, at least sixty days after June 7, 2012, or on or about August 7, 2012, the JJIS Agreement terminated. Such termination allowed the co-trustees to grant an exclusive license to Endotach in July 2013 when Amendment 3 was executed.

## IV.  CONCLUSION

For the reasons stated herein, the Court **DENIES** Defendant Cook Medical Incorporated's Motion to Dismiss for Lack of Standing, Docket No. 67.

IT IS SO ORDERED this 13th day of January, 2014.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

Distribution:

Steven G. Cracraft
BRANNON SOWERS & CRACRAFT PC
scracraft@bscattorneys.com

Bradley G. Lane
BRINKS GILSON & LIONE
blane@brinksgilson.com

Dominic P. Zanfardino
BRINKS GILSON & LIONE
dzanfardino@brinksgilson.com

Jason W. Schigelone
BRINKS GILSON & LIONE
jschigelone@brinksgilson.com

Jeffry Michael Nichols
BRINKS HOFER GILSON & LIONE - CHICAGO IL
jnichols@brinkshofer.com

Michael T. Cooke
FRIEDMAN SUDER & COOKE
mtc@fsclaw.com

Brett Michael Pinkus
FRIEDMAN SUDER & COOKE - FORT WORTH TX
pinkus@fsclaw.com

Jonathan T Suder
FRIEDMAN SUDER & COOKE - FORT WORTH TX
jts@fsclaw.com

Glenn S. Orman
FRIEDMAN, SUDER & COOKE
orman@fsclaw.com